Thomas P. Smith, Jr.
Adam S. Grace
Dina Levy
Mariel Bronen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
Phone: (212) 336-0123 (Levy)
Email: LevyDi@SEC.GOV

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | __ Civ. _____ |
| : | |
| v. : | |
| : | **Jury Trial Demanded** |
| **TERRANCE REAGAN AND NATHANIEL CLAY,** : | |
| : | **ECF Case** |
| **Defendants.** : | |

-------------------------------------------------------- x

## COMPLAINT

Plaintiff Securities and Exchange Commission, for its Complaint against defendants

Terrance Reagan ("Reagan") and Nathaniel Clay ("Clay") (together, "Defendants"), alleges as

follows:

## SUMMARY

1.       From November 2015 to January 2019, Reagan and Clay were registered

representatives at a broker-dealer with branch offices in New York City and Long Island, New

York ("Broker-Dealer A").

2.      As registered representatives, Reagan and Clay each had an obligation to have a reasonable basis for the investment recommendations that they made to their customers.  Yet, they each recommended to at least eight customers a pattern of high cost, in-and-out trading without any reasonable basis to believe that their recommendations were suitable for anyone.

3.      As a result of those recommendations, their customers suffered losses of over $739,000, more than $690,000 of which were from commissions and fees generated by the trading.  Reagan and Clay each received approximately $150,898 in commissions.

4.      Reagan and Clay each violated the antifraud provisions of the federal securities laws because they knew or recklessly disregarded that their recommendations to their customers were unsuitable, and they further violated the antifraud provisions by making material misrepresentations and omissions to their customers in connection with their recommendations.

5.      After leaving Broker-Dealer A and joining Broker-Dealer B, one of Reagan's customers opened a new account at Broker-Dealer B with Reagan as registered representative. Reagan continued the same pattern of fraudulent, unsuitable trading recommendations with respect to that account.  As a result, this customer realized additional losses of approximately $28,692.65, taking into account the approximately $48,564.89 the customer paid in commissions and fees, and Reagan realized approximately $24,000 in commission compensation for himself.

## VIOLATIONS

6.      By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.        Unless the Defendants are permanently restrained and enjoined, the Defendants will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

8.        The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (1) restraining and permanently enjoining each of the Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering each of the Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5) and (d)(7)]; and (c) imposing civil money penalties on each of the Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9.        This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e). and 78aa].  The Defendants, either directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

10.        Venue lies in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this complaint

occurred within the Southern District of New York.  Specifically, Broker-Dealer A maintained

an office in the Southern District of New York during the relevant time period; Defendants

worked in the Southern District of New York during the relevant time period; and relevant trades

were executed on exchanges based in the Southern District of New York.

## DEFENDANTS

11.      **Reagan**, age 53, resides in Coram, New York, and was associated with Broker-

Dealer A from November 2015 to January 2019.  Reagan was associated with Broker-Dealer B

from January 2019 to June 2021.  He was associated with ten other firms between 1995 and

2015, and another from November 2021 to April 2022.  He currently holds Series 7 and 63

licenses.  In March 2015, a customer filed a complaint with FINRA, alleging excessive trading

by Reagan and his then-firm.  In a July 2015 settlement, Reagan contributed $3,300 as part of a

total award to the customer of $10,000.

12.      **Clay**, age 45, resides in New York, New York, and was associated with Broker-

Dealer A from November 2015 to January 2019.  He was associated with three other firms

between 2002 and 2015.  He previously held Series 7 and Series 63 licenses.  In June 2008, a

customer filed an arbitration against Clay alleging excessive trading and improper use of margin,

which resulted in a settlement in which $42,000 was paid by Clay's then-firm.  In November

2015, Clay was terminated from another firm after it was found that, in or around October 2015,

he had misappropriated non-public customer information by taking photos of customer

information from a notebook that he had taken from a colleague.  An arbitration of the matter

resulted in a judgement of $125,000 entered in October 2020 against Clay.

## RELATED ENTITES

13.         **Broker-Dealer A**, is a United Kingdom corporation with its main office in London, England and branch offices in the United States, including New York City.  It has been registered with the Commission as a broker-dealer since 2002.

14.         **Broker-Dealer B**, is a New York limited liability company with its main office in Staten Island, New York.  It has been registered with the Commission as a broker-dealer since 1991.

## FACTS

### A.  Reagan and Clay Each Made Recommendations with No Reasonable Basis

15.         Brokers like Reagan and Clay are required to have a reasonable basis to believe that the recommendations they make are suitable for their customers.  This means that they must understand the risks and rewards, and potential consequences, of the recommendations they make to their customers.  And, given that Reagan and Clay each recommended a pattern of in-and-out trading, they had an obligation to determine whether their recommendations, which imposed exceedingly high costs on the customer, were suitable and in their customers' interests.

16.         Brokers' obligations to make recommendations that have a "reasonable basis" and which are "suitable" for their customers are well-known in the industry, and Reagan and Clay were both aware of those obligations from their years of work at various broker-dealers.

17.         Reagan generally recommended to customers a strategy of quick trading in which he would recommend that a customer purchase a stock, and then, after a short period, recommend that the customer sell a portion or all of the stock and use the proceeds to invest in another stock.

18.      Clay also generally recommended to customers a strategy of quick trading in which he would recommend that a customer purchase a stock, and then, after a short period, recommend that the customer sell a portion or all of the stock and use the proceeds to invest in another stock.

19.      Reagan and Clay each also recommended to customers that they use margin, whereby a customer purchases stock with funds borrowed from the firm with the stock serving as collateral.  Borrowing money to buy stock enables a customer to purchase more stock than could be done by using cash only, and using margin increases both the risks and the costs to the customer.

20.      While recommending potentially costly trading strategies, the only due diligence Reagan and Clay conducted focused on particular issuers and general market conditions.  Neither Reagan nor Clay conducted due diligence to determine the overall impact of costs associated with their recommended trading strategies, and thus failed to properly consider whether their pattern of recommendations were suitable for their customers.

21.      Over time, both Reagan and Clay became aware that various customers' account activity was exceeding thresholds generally used to indicate excessive trading.

22.      At a certain point, it was clear to Reagan that, given the amount of money being traded, the accounts of several customers including, Investor B and Investor H, could not reasonably generate profits sufficient to exceed the amount of commissions being charged.  He brought this to Clay's attention.  However, neither Reagan's nor Clay's approach to those accounts changed.

23.     A supervisor brought a couple of accounts, in which charged commissions were high, to Clay's attention.  However, Clay did not do anything to address the problem in any of these accounts or other accounts, or change his approach in any way.

24.     Investor A complained to Reagan that he was losing money on many trades, in part because he was paying high commissions, and expressed a desire in about July 2018 to close his account.  Clay then took over handling the account, but did not change the approach to investing.  As a result, in November 2018, Investor A discontinued the trading in his account and later closed it.

25.     The cost-to-equity ratio, also referred to as the break-even ratio, measures the amount an account must appreciate annually to cover costs, such as commissions and other fees associated with the trading in the account.  The annual turnover ratio represents the total value of annual purchases made in the account divided by the account's average monthly balance, *i.e.*, the number of times per year a customer's securities are replaced by new securities.  A cost-to-equity ratio of 20% or higher or an annual turnover ratio of 6 or higher indicates excessive trading.

26.     Although Reagan and Clay were each aware that customer accounts at various times had cost-to-equity ratios greater than 20% and annual turnover ratios greater than 6, they continued to engage in the same short-term trading strategy.

27.     In nine Broker-Dealer A accounts relating to eight customers (one customer had two accounts), Reagan and Clay's in-and-out trading strategies resulted in astronomical cost-to-equity ratios—ranging from 203% to 620% per account, and averaging 329% across the accounts.  In other words, due to the costs imposed on the customers, the value of the accounts for which Reagan and Clay each made recommendations had to increase in value by an average

of 329% on a yearly basis before the customer would see a single dollar of profit.  Similarly, the

turnover ratios for each account ranged from 60 to 255, averaging 127 across all nine accounts.

28.      These nine customer accounts lost a total of $739,970, and were charged a total of

$690,237 in commissions and fees.

29.      Reagan and Clay, who worked as partners, each had discretion from Broker-

Dealer A to charge whatever commission they deemed appropriate on an individual transaction,

subject to a maximum of 5% of the principal amount of the trade.

30.      Reagan and Clay shared responsibility for each of the nine customer accounts at

Broker-Dealer A.  Reagan and Clay routinely discussed strategy and trading as to each account,

however, at times, one or the other served as the primary customer contact.  For example,

Reagan was the primary contact for Investor A until July 2018, when Clay became the primary

contact, and Reagan was the primary contact for Investor H during the lifetime of Investor H's

account.

31.      For the trading at issue, the commission split between the Broker-Dealer A, Clay,

and Reagan was 50%-25%-25%, respectively.

32.       After he moved to Broker-Dealer B, Reagan continued to employ the same

strategy in the account of a Broker-Dealer A customer that had opened a new account at Broker-

Dealer B.  After 14 months of trading, that customer's account showed a cost-to-equity ratio of

49% and a turnover ratio of 48.

33.        Reagan and Clay's recommendations in the ten customer accounts described above resulted in the following ratios, costs (commissions and fees), and losses:

| Customer | Annualized Cost / Equity Ratio | Turnover Rate | Avg. Equity | Total Costs | Account Gain/(Loss) After Costs |
|---|---|---|---|---|---|
| Investor A | 241.50% | 102.21 | $14,859.67 | $38,877.31 | ($48,934.89) |
| Investor B | 334.52% | 194.27 | $54,190.16 | $151,051.34 | ($121,245.08) |
| Investor C | 620.30% | 153.13 | $2,128.24 | $8,801.28 | ($13,236.28) |
| Investor D | 202.76% | 60.27 | $12,749.74 | $19,386.35 | ($24,046.32) |
| Investor E | 223.36% | 66.84 | $8,897.51 | $13,249.11 | ($28,729.93) |
| Investor F | 286.45% | 89.85 | $6,440.49 | $15,373.13 | ($13,614.00) |
| Investor G, Acct. #1 | 464.55% | 153.26 | $8,941.60 | $38,079.93 | ($41,159.79) |
| Investor G, Acct. #2 | 226.39% | 66.71 | $10,519.39 | $25,916.91 | ($23,882.73) |
| Investor H | 367.43% | 255.21 | $38,735.29 | $379,502.35 | ($424,696.70) |
| **9 Acct Totals (B-D A)** | | | $157,462.09 | $690,237.71 | ($739,545.72) |
| **9 Acct Averages (B-D A)** | 329.70% | 126.86 | | | |
| | | | | | |
| Investor H B-D B Account | 48.63% | 47.57 | $85,602.14 | $48,564.89 | ($28,692.65) |

34.        Reagan knew, or was reckless in not knowing, that the recommendations he made were almost certain to lose money and, he had no reasonable basis for the recommendations he made.  In particular, Reagan had no basis to believe that the frequency with which he recommended that his customers buy and sell securities, combined with the per-trade costs imposed on customers, would be suitable for anyone.

35.        Clay also knew, or was reckless in not knowing, that the recommendations he made were almost certain to lose money and, he had no reasonable basis for the recommendations he made.  In particular, Clay had no basis to believe that the frequency with which he recommended that his customers buy and sell securities, combined with the per-trade costs imposed on customers, would be suitable for anyone.

## B.  Reagan and Clay Each Made Material Misrepresentations and Omissions to Their Customers

36.        Reagan and Clay each knowingly or recklessly misrepresented their strategy as a profitable one, when, as shown in the chart above, it was a high-cost strategy that left customers

with little chance of overcoming those costs while generating significant profits for Reagan, Clay, and their firm.

37.     Reagan and Clay each sought out high net-worth individuals who would rely on Reagan and Clay for their investing expertise rather than take a hands-on approach to the investing decisions.

38.     Reagan and Clay each told potential customers that they would provide opportunities to outperform the market and would earn good returns, and emphasized their skill in making money by picking stocks.

39.     At times, both Reagan and Clay engaged in high-pressure tactics to convince customers to open accounts and to engage in stock transactions, calling the customers repeatedly to pitch trades.

40.     When some of the eight customers complained about losses in their account, Reagan promised that if they invested additional money, he or Clay could turn the customers' losses around and make money.  Clay made similar promises.

41.     Neither Reagan nor Clay ever disclosed to customers that the frequency of trading, along with the high transaction costs, would almost certainly outstrip any potential gains in the accounts, and that the investment strategy was not suitable for any investor.

42.     For example, in about November 2017, Reagan solicited Investor A to open an account at Broker-Dealer A.  Reagan engaged in frequent and high-pressure pitches when recommending trades to Investor A.  Reagan did not discuss trading strategy with Investor A nor tell him that he would pay high commissions as a result of the frequent trading in his account, or that this would result in staggering losses.

43.     Although the initial trades in Investor A's account were profitable, Investor A realized after several months that he was losing money on many trades, in part because he was paying high commissions.  Investor A complained to Reagan about this, and when he expressed a desire in about July 2018 to close his account, Clay took over in handling the account, promising that he would turn the account around if Investor A gave him a month.

44.     Clay did not disclose to Investor A that the pattern of paying high commissions as a result of frequent trading would continue and lead to more losses.  In November 2018, after the pattern had continued, Investor A discontinued the trading in his account and later closed it. Over the life of the account, Investor A invested $49,308 and had losses of $48,934, including $38,877 in commissions and fees, despite an average equity of less than $15,000.  His account had a cost to equity ratio of 241.5% and an account and a turnover ratio of 102.21.

45.     Another investor, Investor D, opened an account at Broker-Dealer A in December 2016, in part because he found Reagan personable and compelling.  Reagan told Investor D that he would have great investment returns.  Reagan did not discuss trading strategies with Investor D nor did Reagan tell Investor D that that he would pay high commissions as a result of frequent trading in his account or that this would result in large losses.

46.     Eventually, Investor D began interacting primarily with Clay.  Clay did not discuss trading strategy with Investor D nor tell Investor D that he would pay, and then was in fact paying, high commissions as a result of frequent trading in his account, or that this would result in large losses.

47.     At the outset, there were positive returns on the trading in his account.  However, as trading continued, Investor D could see that his account was losing money, and when he examined his account more closely, he was shocked to realize how high the commissions and

fees were.  He complained to Clay, who responded that this was the risk of investing in the market.  Given this experience, Investor D ended his relationship with Broker-Dealer A.  His account had a cost-to-equity ratio of 202.76% and a turnover ratio of 60.27.  He had invested $25,770, and suffered losses of $24,046, including commissions and fees of over $19,000, despite average equity of less than $13,000.

48.     These misrepresentations and omissions were material because investment strategy and profitability are central to a reasonable investor's investment decisions.

49.     In addition, Reagan and Clay were both aware that trading in at least five of the nine accounts had been flagged by Broker-Dealer A's systems for exceeding the cost-to-equity and turnover thresholds.

50.     They were also aware that as a result of the accounts being flagged, letters were sent to customers in an attempt to confirm the customers' awareness of the activity in their accounts.  However, those letters did not provide customers with an explanation or understanding of how the recommended trading was impacting total costs and the customers' ability to earn a profit.

51.     Reagan understood that Broker-Dealer A sent these activity letters to customers whose accounts had excessive trading, and excessive cost-to-equity and turnover ratios, and had lost money.

52.     Clay knew activity letters were sent for accounts that exceeded certain trading thresholds.

53.     Reagan and Clay each failed to tell their customers why the activity letters were sent to them.  They further failed to tell their customers that the customers were receiving such letters because the trading in their accounts was potentially excessive.

54.      These misstatements and omissions were material because information about how the recommended trading was impacting total costs and the customers' ability to earn a profit is central to a reasonable investor's investment decisions.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act (Both Defendants)

55.      The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54, as if fully set forth herein.

56.      The Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

57.      By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Both Defendants)

58.      The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54, as if fully set forth herein.

59.      The Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate

commerce or of the mails, or of the facilities of a national securities exchange, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

60.     By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELEIF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding Defendants violated the securities laws and rules as alleged against them here;

### II.

Permanently enjoining each of the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

### III.

Ordering each of the Defendants to disgorge any ill-gotten gains obtained as a result of the violations alleged in the Complaint pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. § 78u(d)(3), (d)(5) and (d)(7)], and ordering them to pay prejudgment interest thereon;

IV.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)]; and

V.

Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried to a jury.


Dated: <u>January 12, 2023</u>
        New York, NY


                              Respectfully submitted,

                              SECURITIES AND EXCHANGE COMMISSION


                              Thomas P. Smith Jr.
                              _____
                              Thomas P. Smith, Jr.
                              Adam S. Grace
                              Dina Levy
                              Mariel Bronen
                              New York Regional Office
                              Securities and Exchange Commission
                              100 Pearl Street, Suite 20-100
                              New York, New York 10004
                              Phone: (212) 336-0123 (Levy)
                              Email: LevyDi@SEC.GOV

                              *Attorneys for Plaintiff*